UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  6/30/2023
```

DIANE DOYLE,

                          Plaintiff,

              v.

MID-HUDSON VALLEY FEDERAL CREDIT
UNION,

                          Defendant.

20 CV 2087 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

## OPINION AND ORDER

Plaintiff Diane Doyle ("Plaintiff" or "Diane") brings this action against Defendant Mid-Hudson Valley Federal Credit Union ("Defendant"), asserting claims of age discrimination under the Age Discrimination in Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL"). (ECF No. 9, at 1.) Plaintiff also requests liquidated, compensatory, and punitive damages for the alleged injuries Plaintiff sustained from Defendant's actions. (ECF No. 9, at 6.) Before the Court is Defendant's Motion for Summary Judgment on Plaintiff's age discrimination claims, which is brought pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"). (ECF No. 25.). For the following reasons, Defendant's motion is DENIED.

## PROCEDURAL BACKGROUND

On March 9, 2020, Plaintiff commenced the instant action by filing a Complaint (ECF No. 1), in which she alleged claims for age discrimination under the ADEA and NYSHRL. Subsequently, on May 11, 2020, Plaintiff filed an Amended Complaint ("AC"). (ECF no. 9.) Defendant answered Plaintiff's Amended Complaint on that same day. (ECF No. 10.)

1

On November 1, 2021, Defendant filed a motion for summary judgment pursuant to Rule 56 of the FRCP (the "Motion") as well as supporting papers. (ECF No. 25.) Plaintiff opposed Defendant's Motion (ECF Nos. 27 and 28), and Defendant replied to Plaintiff's opposition. (ECF No. 32.). Defendant's Motion is now before the Court.

## FACTUAL BACKGROUND

The facts are gleaned mainly from the Amended Complaint ("Compl.") (ECF No. 9), Defendant's Rule 56.1 Statement of Undisputed Material Facts (ECF No. 26), Plaintiff's Response to Defendant's Rule 56.1 Statement (ECF No. 31), and depositions of the relevant actors (ECF No. 34). They are uncontested except where indicated.

### I.    Relevant Actors

In April 2012, Plaintiff began working at Mid-Hudson Valley Federal Credit Union ("MHVCFU"), a member-owned credit union serving clients throughout Ulster, Dutchess, and Orange counties, as the Branch Manager of MHVFCU's Middletown, New York branch (the "Branch"). (ECF No. 31 ¶¶ 1, 2.) Plaintiff was tasked with overseeing her branch's progress toward its quarterly sales incentives, including goals for opening new accounts and memberships. (*Id.* ¶ 25.)  As part of this oversight, Plaintiff held a daily "huddle" each morning with members of her sales team to update them on their progress towards meeting their quarterly goals and assist them in doing so. (*Id.*)

Plaintiff reported to Senior Branch Manager Vicki Mastronardi ("Mastronardi"). Mastronardi's responsibilities included overseeing the Branch Managers of MHVCFU's Middletown and Newburgh branches, as well as serving as the Branch Manager for MHVCFU's Fishkill branch. (*Id.* ¶¶ 3,4.)

Additionally, at all relevant times, Judy Hamilton ("Hamilton") held the position of Vice President, Human Resources at MHVFCU, Sergio Valentin ("Valentin") was a Lead Member Service Representative ("Lead MSR") at MHVCFU's Middletown branch, and Christopher Gomez ("Gomez") was the Senior Vice President and Chief Retail Officer at MHVFCU. (*Id.* ¶¶ 5-69.)

## II.    Description of Work Expectations, Goals, and Policies at MHVFCU

When Gomez was appointed as the Chief Retail Officer of MHVFCU in January of 2018, he modified the metrics that MHVFCU uses to measure the success of each branch. For instance, branch goals became more team-based and branch employees no longer had individual monthly sales goals. (*Id.* ¶¶ 5-69.) Gomez also encouraged employees to attend networking events to build professional connections and market MHVFCU. (*Id.* ¶ 14.) Plaintiff regularly attended these events. (*Id.* ¶ 14; *see also* ECF No. 34-2, at 40.)

Additionally, Gomez targeted sales of membership accounts, credit cards, and other offerings to younger individuals to maintain and expand market share. (*Id.* ¶ 14.) This effort included investing in technology to improve MHVFCU's mobile application and online banking services. (*Id.* ¶ 14.) It also encompassed various member-service and networking initiatives that were directed at younger individuals. (*Id.* ¶¶ 14, 17.) Although Defendant claims that MHVFCU did not hire, promote, or otherwise target any employees based on their age, Plaintiff categorically denies this. Plaintiff alleges that Gomez, in his capacity as the Chief Retail Officer of MHVFCU, replaced older employees with younger, less experienced individuals precisely because of these employees' respective ages. (*Id.* ¶ 19; *see also* ECF No. 34-2, at 31; ECF No. 34-1, at 106-115.)

MHVFCU maintains an Ethics and Code of Conduct Policy (the "Policy") that prohibits employees from engaging in fraudulent and dishonest activities in the course of their employment.

(*Id.* ¶ 20.) The Policy prohibits, among other types of deceptive actions, forgeries, manipulation of loan accounts, documents, and computer records, and international violations of MHVCFU rules, internal controls, regulations, or procedures. (*Id*.) MHVFCU's Employee Handbook (the "Handbook") contains analogous prohibitions on fraudulent and dishonest conduct as well as establishes that violations of MHVFCU policies, rules, and procedures will result in disciplinary action, including termination. (*Id.* ¶ 20.)

MHVFCU also maintains a protocol for opening new member accounts via an online portal, which is termed the "DNA Manual." The DNA Manual specifies that the following documents are required to open a new membership account: (1) a membership application; (2) an unexpired government photo ID; and (3) proof of physical address. (*Id.* ¶ 22.)

### III.    Events Preceding Plaintiff's Termination

The parties dispute many of the circumstances precipitating Defendant's termination of Plaintiff. Below, the Court details their disparate accounts.

#### a.   *Plaintiff's Management of Her Sales Team in the First Quarter of 2019*

Defendant claims that the Branch fell behind its quarter incentive target for new membership accounts (the "New Members Goal") in the first quarter ("Q1") of 2019. (*Id.* ¶ 23-25.) Defendant further claims that, in consequence, Plaintiff began pressuring her employees to meet that goal, including directing her sales staff to open new membership accounts by any means necessary. (*Id.* ¶ 26.) More specifically, Defendant alleges that Plaintiff repeatedly asked her sales staff if they knew any friends or family whom they could solicit to open a new account. Plaintiff, for instance, purportedly pressured Teller Dee Gagnon to have her four grandchildren open accounts and Teller Lisa Kamia to have her daughter open an account. (*Id.* ¶ 29.)

Conversely, Plaintiff offers documentation indicating that Plaintiff's branch was on track to meet the New Members Goal near the end of Q1 (relevant documentation indicates that approximately only 5% of the goal remained as of March 24, 2019). (*Id.* ¶ 26; *see also* ECF No. 25-8, at 2; ECF No. 34-1, at 22.) Plaintiff also evidences testimony from herself and another employee at the Branch, Deborah Fox ("Fox"), suggesting that Plaintiff did not apply the type of pressure Defendant describes to her sales staff. (*Id.* ¶ 27; ECF No. 30.)

Defendant alleges that, due to Plaintiff's increasing pressure on her sales staff to meet the New Members Goal, on March 29, 2019, Valentin indicated that he could speak to his sister regarding opening an account. (ECF No. 31 ¶ 30.) Plaintiff purportedly responded that Valentin should have his sister open an account by the end of that day; she allegedly asked Valentin to visit his sister at her home to obtain a new account from her, even offering to drive Valentin to his sister's home. (*Id.* ¶ 31.) That afternoon, Valentin updated Plaintiff that his sister told him that she was willing to open an account but could not come to their branch that day (i.e., March 29, 2019). (*Id.* ¶ 32.) Plaintiff allegedly responded that the account must be opened on March 29, 2019, and she suggested that Valentin obtain the information he needed to open an account for his sister via telephone, then get her sister's signature over the upcoming weekend. (*Id.* ¶ 33.) Plaintiff denies each of the preceding allegations, insisting that she never pressured Valentin to open an account in his sister's name. (*Id.* ¶¶ 30-33.)

It is undisputed, however, that Valentin signed his sister's name on the membership application and submitted it for processing on the following Monday. (*Id.* ¶ 35.) Further, the parties agree that Plaintiff questioned Valentin as to whether he signed his sister's application shortly after he submitted it (either in the first or second week of April 2019), as Plaintiff noticed that the signature was in Valentin's handwriting and did not include the correct last name. (*Id.* ¶ 36.)

Yet, the parties disagree over whether: (1) Valentin admitted to signing his sister's application to Plaintiff when she questioned him (Defendant alleges that Valentin did make this admission, whereas Plaintiff alleges he did not); and (2) Plaintiff told Valentin that she would hold back his sister's application in order for him to obtain his sister's real signature (Defendant alleges that Plaintiff made this statement, whereas Plaintiff alleges that she did not). (*Id.* ¶ 39). The parties also disagree about the timing of Plaintiff's discovery of Valentin's forgery— although Defendant asserts that Plaintiff discovered Valentin's forgery in the first week of April 2019, Plaintiff claims that she could have made this discovery in either the first or second week of April 2019. (*Id.* ¶¶ 58-62.)

  *b. Investigation into Valentin's Forgery*

It is undisputed that Plaintiff contacted Mastronardi to report that Valentin forged his sister's signature after she discovered it. (*Id.* ¶ 39.). However, the parties disagree as to how long Plaintiff waited after this discovery to convey her findings to Mastronardi. Whereas Defendant alleges that Plaintiff waited to contact Mastronardi until Friday, April 12, 2019, Plaintiff posits that she called Mastronardi to flag Valentin's forgery immediately after discovering it. (*Id.*)

Subsequently, in response to Plaintiff's concerns, Mastronardi requested that Plaintiff send her the relevant documentation for Valentin's sister's account in order to commence an investigation. (*Id.* ¶ 43.) On the following Monday, April 15, 2019, after receiving this documentation, Mastronardi alerted Gomez to Valentin's potential forgery and requested he call her to discuss this issue. (*Id.*) After connecting, Mastronardi and Gomez immediately began an investigation. (*Id.* ¶ 44.) Although Defendant asserts that this investigation was a good-faith effort to determine the merits of Plaintiff's allegations and discover why the forgery occurred, Plaintiff

claims that the purpose of the investigation was to implicate Plaintiff as a wrongful participant as a pretext for terminating her. (*Id.* ¶ 45.)

It is also undisputed that, as part of their investigation, Gomez and Mastronardi interviewed various employees from Plaintiff's branch, including Plaintiff, Valentin, Fox, Dee Gagnon, and Jonathan Augustin. (*Id.* ¶ 47.)  However, the parties deny each other's accounts of the information gleaned from these interviews. Plaintiff, in particular, argues that Defendants' accounts are inaccurate because they are sourced from typed notes that Mastronardi copied from her original, contemporaneous handwritten notes, which Mastronardi destroyed. (*Id.* ¶ 56)

Defendant, for instance, claims that Gomez and Mastronardi questioned Plaintiff not only about the forgery, but also regarding Plaintiff's purported requirement that her staff routinely recite the pledge of allegiance. (*Id.* ¶ 48.) Additionally, Defendant alleges that Plaintiff admitted she pressured her employees to solicit family members to open accounts and conceded that it was inappropriate for MHVFCU employees to do so. (*Id.* ¶ 49.) Plaintiff denies that she required her staff to recite the pledge of allegiance. (*Id.* ¶ 48.) She also rejects Defendants' characterization of her approach toward her staff's solicitation of new members, asserting that she simply identified different avenues (including relatives) through which her employees could reach their sales goals. (*Id.* ¶ 49.) Other, pertinent points of disagreement arising from employee interviews are described *infra*, such as the parties' dispute over whether Valentin initially admitted to forging his sister's signature.

IV.    **Consequences of Gomez and Mastronardi's Investigation; Plaintiff's Age Discrimination Allegations**

Defendant notes that Gomez and Mastronardi reached a number of conclusions that reflected poorly on Plaintiff following their investigation of the forgery incident. Specifically,

Defendant claims that Gomez and Mastronardi determined that: (1) Valentin forged his sister's signature on her membership account application; (2) Plaintiff created an unhealthy and inappropriate environment within the Branch; (3) Plaintiff instructed Valentin to violate MHVFCU protocol for opening new membership accounts; and (4) Plaintiff likely covered up Valentin's forgery, given that she waited nearly two weeks after discovering the forgery to report it. (*Id.* ¶ 76-78.) Based on these conclusions, Gomez and Mastronardi recommended the termination of Plaintiff and Valentin from employment with MHVFCU. (*Id.* ¶ 77.) As indicated *supra*, Plaintiff categorically denies each of the conclusions of Gomez and Mastronardi's investigation, with the notable exception that she agrees Valentin forged his sister's signature. (*Id.* ¶¶ 76-81.) She instead claims that she was fired because Gomez believed that she was too old.

Plaintiff supports her claim that her termination was a product of age discrimination with a number of allegations concerning how Gomez treated herself and other employees over the age of 40. She alleges, for instance, that Gomez referred to older employees with derogatory labels such as "crazy," "old as dirt," "old lady," and "crotchety old bat." (*Id.* ¶ 107; ECF No. 31, at 37.) Moreover, Plaintiff claims that Mastronardi questioned her regarding her retirement plans, even though Plaintiff did not intend to retire in the near term and did not communicate any intention to retire to other MHVFCU employees. (*Id.* ¶ 107.) And, finally, Plaintiff states that Gomez only interacted meaningfully with younger employees when he visited her branch. (*Id.* ¶ 114.)

Marcie Tuey-Bigelow ("Tuey-Bigelow"), who served as MVHFCU's Branch Sales Manager from 2011 through June of 2019 and was (in her words) "not a friend of [Plaintiff's]," similarly testified that Gomez "look[ed] for any way that [Plaintiff] would mess up or want to retire." (ECF No. 31, at 36.) Moreover, Tuey-Bigelow testified that Gomez told her "a couple of times… [Plaintiff is] old as dirt" and that "[o]ther times he'd say she's too old… she's just too old

8

to do what we want to do." (ECF No. 31, at 36.)  She also opined that Gomez "had a really laser focus at [Plaintiff] and getting her out and her age was the common denominator that was heard by me and others." (ECF No. 31, at 37.) Similarly, Tuey-Bigelow testified that Gomez placed another older employee, Guy Greco ("Greco"), under her supervision in the hope that Greco would resign, as Gomez believed that Greco was too old. (ECF No. 34-4, at 62.) And, finally, Tuey-Bigelow offered a number of other, more general statements where she related that Gomez discriminated against older employees, such as "there was definitely a lack of sensitivity to anybody who was older and there was a real promotion for anybody who fit into a younger professional category." (ECF No. 34-4, at 67.)

Conversely, Defendant reasons that Plaintiff herself does not attribute her termination to age discrimination, given that her complaint to the Occupational Safety and Health Administration ("OSHA") does not attribute her termination to her age; her complaint instead attributes her termination to her reporting of Valentin's forgery. (ECF No. 31 ¶ 85.) Defendant also claims that, even though MHVFCU has experienced changes in staffing over the past few years, the age of employees was never a factor in these decisions. (*Id.* ¶ 91-102.)  Specifically, Defendant alleges that Greco actually applied for an internal transfer to a position as a Business Development Officer, that he was offered this position (and accepted it) because he was a "strong candidate" based on his experience and communication ability, and that his age played no role in the decision to transfer him. (*Id.*)

Finally, it is undisputed that Defendant hired Denise Romero, who was 35 years old at the time of her hiring, to replace Plaintiff as manager of Plaintiff's Branch following the dismissal of Plaintiff on April 26, 2019. (ECF No. 31, at 41; ECF No. 9, at 5.)

## LEGAL STANDARD

### I.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This Rule states, in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents ... [and] affidavits or declarations," Fed.R.Civ.P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party, which must identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 244 (S.D.N.Y. 2001).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine

the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the records" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed.R.Civ.P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## <u>DISCUSSION</u>

### I.    Plaintiff's Claims for Age Discrimination Under the ADEA and NYSHRL

Plaintiff asserts claims of age discrimination under the Age Discrimination in Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL"). (ECF No. 9, at 1.) As discussed *infra*, these claims are analyzed under the same framework.

### A. Standard

#### i. The McDonnell Douglas Framework is the prevailing framework for analyzing age discrimination claims under the ADEA and NYSHRL.

Under both the ADEA and NYSHRL, it is unlawful for an employer to discharge, or otherwise discriminate against, any individual with respect to their compensation, terms, conditions, or privileges of employment, because of an individual's age. *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (citing 29 U.S.C. § 623(a)(1)). Age-discrimination claims brought pursuant to the NYSHRL are "subject to the same analysis as claims brought under the ADEA." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citation omitted); *see also Tongring v. Bronx Cmty. College of the City Univ. of N.Y. Sys.*, No. 12-CV-6854 (ALC)(FM), 2014 WL 463616, at *6 (S.D.N.Y. Feb. 4, 2014) (citations omitted); *Gorzynski*, 596 F.3d at 105 n. 6 ("The law governing ADEA claims has been held to be identical to that [which governs] claims made under the NYHRL.") (citation omitted).

Pursuant to the prevailing framework, termed the *McDonnell Douglas* framework, Plaintiff bears the burden of establishing a *prima facie* case of age discrimination by showing that: (i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone "substantially younger." *Id.* (*citing O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)). Second, if the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *James*

*v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000) (applying *McDonnell Douglas* to ADEA claim). And, finally, if the employer articulates a legitimate, nondiscriminatory reason for its actions, the plaintiff bears the burden to show that the proffered nondiscriminatory reason was merely a pretext for discrimination. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Within this framework, and as discussed *infra*, "[t]he burden on the plaintiff of presenting a *prima facie* case under *McDonnell Douglas* is 'minimal.'" *Id.* citing *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000).

### ii. The ultimate question is whether the employer's stated reason for termination was a pretext for discrimination.

Significantly, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's*, 509 U.S. at 507, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089) (alteration in original); *accord Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000). The plaintiff, therefore, "must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's age was the real reason for the discharge." *Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994) (citing *St. Mary's*, 509 U.S. at 515, 113 S.Ct. 2742).

Nevertheless, although the plaintiff must prove that the defendant's proffered reasons for termination were a pretext, they are not always required to "introduce additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. "In appropriate circumstances," the evidence of pretext alone is sufficient to "infer ... that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 147, 120 S.Ct. 2097; *see also Schnabel*,

232 F.3d at 90 ("the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff can satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff'" (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097)).

Plaintiff may demonstrate that Defendant's non-discriminatory rationale is a pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Ottaviani v. State Univ. of New York at New Paltz*, 679 F.Supp. 288, 298 (S.D.N.Y.1988) (quoting *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Evidence of pretext includes, *inter alia*, "discriminatory statements or admissions, the mix of the workforce, an atmosphere of discrimination, the employer's general practices, comparative evidence, and statistics." *Id.* (citation omitted). The Second Circuit has "reject[ed] any categorical rule requiring age discrimination plaintiffs to offer, in addition to their *prima facie* case and evidence of pretext, further evidence that age discrimination was the actual motivation in order to satisfy their burden." *Abdu–Brisson*, 239 F.3d at 469 (citation omitted).

**B. Analysis**

***i.    Plaintiff has proven a prima facia case of discrimination and Defendant has demonstrated a legitimate, non-discriminatory reason for discharge.***

Despite the extensive process established in *McDonnell Douglas*, a district court may assume that a plaintiff has established a *prima facie* case and skip to the final step in the *McDonnell Douglas* analysis, presuming the employer has articulated a legitimate nondiscriminatory reason

14

for the adverse employment action.[1] *See, e.g., Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 188 (2d Cir.2006) (declining to resolve the dispute regarding the establishment of a *prima facie* case of age discrimination on the basis that the plaintiff had not "pointed to any record evidence to dispute [the defendant's] legitimate reason (so far as the ADEA is concerned) for the alleged adverse employment action"); *Roge v. NYP Holdings Inc.*, 257 F.3d 164, 168 (2d Cir.2001) (declining to decide whether a *prima facie* case was made in an ADEA case because the defendant "met its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination, and [plaintiff] has failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact"); *accord Morris v. Ales Group USA, Inc.*, 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007) ("Rather than apply the *McDonnell Douglas* test formalistically, the Court will assume that [plaintiff] has made out a *prima facie* case of discrimination on this claim."); *Mathews v. Huntington*, 499 F.Supp.2d 258, 264 (E.D.N.Y.2007) ("At the outset, the Court assumes that the plaintiff has made out the prima facie case required by *McDonnell Douglas*."); *Tomney v. Int'l Ctr. for the Disabled*, 357 F.Supp.2d 721, 742 (S.D.N.Y.2005*); Domb v. Metro. Life Ins. Co.*, 2003 WL 21878784, at *8 (S.D.N.Y. Aug.7, 2003); *Lapsley v. Columbia University–College of Physicians and Surgeons*, 999 F.Supp. 506, 515 (S.D.N.Y.1998); *Lanahan v. Mut. Life Ins. Co. of N.Y.*, 15 F.Supp.2d 381, 384 (S.D.N.Y.1998), aff'd, 181 F.3d 83, 1999 WL 314167 (2d Cir.1999). The Court follows this approach here, and it thereby considers only whether Plaintiff has pointed

---

[1] Briefly, the Court notes that Plaintiff is a member of the ADEA-protected over-40 age class, as she was over the age of 60 at all relevant times. *Curley v. St. John's Univ.*, 19 F. Supp. 2d 181, 191 (S.D.N.Y. 1998) (noting that the plaintiff was a member of the ADEA-protected over-40 age class because he was likewise over the age of 60 at all relevant times). (ECF No. 9 ¶ 7.)

to evidence that reasonably supports a finding that her termination was based on age, and that Defendant's proffered reason for her termination was merely a pretext.[2]

### ii.    Plaintiff has raised a material question of fact as to whether Defendant's proffered nondiscriminatory reason was merely a pretext for discrimination.

The Court now proceeds to the determinate issue of whether there is a material question of fact as to whether Defendant's non-discriminatory justification was a pretext for age discrimination. The Court first considers Plaintiff's evidence, then Defendant's evidence, and lastly the entire record, with a recognition of the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir.1997); *see also Siano v. Haber*, 40 F.Supp.2d 516, 520 (S.D.N.Y.1999), *aff'd mem.*, 201 F.3d 432 (2d Cir.1999).

Plaintiff presents a litany of circumstances that, considered collectively, raise the plausible inference that Defendant discriminated against her due to her age. This includes Plaintiff's allegations that: (1) she was told by another employee that Gomez "does not like people over [the age of] 40" (ECF No. 31 ¶107; ECF No. 31, at 37; ECF No. 34-1, at 106); (2) Mastronardi and Gomez each questioned Plaintiff regarding her retirement plans, even though Plaintiff did not intend to retire in the near term (or communicate that she intended to do so) (ECF No 31 ¶ 107; ECF No. 34-1, at 97); and (3) Gomez only interacted meaningfully with younger employees when he visited her branch. (ECF No. 31 ¶ 114.) Here, it is also worth noting that Defendant hired Denise

---

[2] The Court notes here that Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant alleges that Plaintiff was fired because she "excessively pressured her staff to hit sales goals, authorized one of her employees to open a new member account against MHVFCU protocol, and attempted to cover up that employee's forgery before ultimately reporting the incident to MHVFCU management nearly two (2) weeks after discovering it." (ECF No. 33, at 7); *see also Reeves*, 530 U.S. at 146, 120 S.Ct. 2097; *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 440 (S.D.N.Y. 2007), aff'd, 331 F. App'x 874 (2d Cir. 2009).

Romero, who was 35 years old at the time of her hiring, to replace Plaintiff as manager of the Branch. (ECF No. 31, at 41.)

Tuey-Bigelow, who was a colleague of Gomez's and Plaintiff's at all relevant times, expanded on Plaintiff's claims. She stated that Gomez: (1) told her "a couple of times… [Plaintiff is] old as dirt" and that "[o]ther times he'd say she's too old… she's just too old to do what we want to do" (ECF No. 31, at 36); (2) called another employee, Joanne Stanzione, "old and crotchety and miserable" (ECF No. 34-4, at 23); (3) asked Tuey-Bigelow when Plaintiff would retire "maybe eight times" (ECF No. 34-4, at 51); and (4) "had a really laser focus at Diane and getting her out and her age was the common denominator that was heard by me and others." (ECF No. 31, at 37.) Additionally, Tuey-Bigelow recounted that Gomez placed another older employee, Guy Greco ("Greco"), under her supervision in the hope that Greco would resign, as Gomez believed Greco was too old. (ECF No. 34-4, at 62.) Gomez's treatment of Plaintiff and Greco, in part, left Tuey-Below with the impression that "there was definitely a lack of sensitivity to anybody who was older and there was a real promotion for anybody who fit into a younger professional category." (ECF No. 34-4, at 67.)

Defendant, however, argues that Plaintiff and Tuey-Bigelow offer false accounts of Gomez's treatment of Plaintiff and other older employees, such as Greco. As detailed *supra*, Defendant claims that: (1) the age of employees was never a factor in hiring or firing decisions (*Id.* ¶¶ 91-102); and (2) Greco actually applied for an internal transfer to a position as a Business Development Officer, that he was offered this position (and accepted it) because he was a "strong candidate" based on his experience and communication ability, and that his age played no role in the decision to transfer him. (*Id.*) Gomez, for his part, denies ever making any derogatory

statements about older employees, or indeed discriminating against them in any way. (ECF No. 34-2, at 31-75.)

In light of the allegations pertaining to Gomez's discriminatory statements and conduct, the Court finds that a material issue of fact exists as to whether Defendant's proffered reason for terminating Plaintiff was a pretext for age discrimination. Plaintiff offers a credible body of allegations indicating a pattern of discriminatory comments and employment actions directed at herself and other older employees, which is supported by Tuey-Bigelow. It is also undisputed that Plaintiff was replaced with a much younger employee. Significantly, courts in this district have routinely denied motions for summary judgment with respect to age discrimination claims where analogous age-related derogatory comments were directed at an employee who later suffered an adverse employment action, despite the existence of an ostensibly legitimate basis for that action. *See Curley v. St. John's Univ.*, 19 F. Supp. 2d 181, 191 (denying Defendant's motion for summary judgment as to Plaintiff's age discrimination claims where Plaintiff alleged that decision-makers made statements such as "why would you want to stay around here after you are 60" and "when you hit the big 60 you are over the hill," despite evidence that Plaintiff engaged in unprofessional conduct and performed poorly in his job); *see also Hird-Moorhouse v. Belgian Mission to United Nations*, No. 03 CIV. 9688. 2010 WL 3910742, at *5-6 (S.D.N.Y. Oct 5. 2010) (denying Defendant's motion for summary judgment as to Plaintiff's age discrimination claims where Plaintiff alleged that supervisors told Plaintiff they "wanted a 'younger image' in the office" and that Plaintiff was "too old for the job"); *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424,433 (1st Cir. 2000) (explaining that "evidence of age-related comments could support an inference of pretext and discriminatory animus"); *Owens v. new York City housing Authority*, 934 F.2d 405, 410 (2d Cir. 1991 (noting that evidence that an employer made discriminatory comments is

sufficient to overcome a motion for summary judgment); *Schnabel*, 232 F.3d at 87 ("[T]he fact that [Plaintiff] was replaced by a 31–year–old is sufficient to give rise to the inference that he was the victim of discrimination"); *Dressler v. New York City Dep't of Educ.*, No. 10 CIV. 3769 JPO, 2012 WL 1038600, at *10 (S.D.N.Y. Mar. 29, 2012) (noting that granting summary judgment in the context of age discrimination claims is "inappropriate except in extraordinary cases" because the question of pretext "goes to the state of mind" of supervising employees). Accordingly, Defendant's motion for summary judgment as to Plaintiff's age discrimination claims under the ADEA and NYSHRL is denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment is DENIED. The parties are directed to appear for a telephonic pretrial status conference on September 14, 2023, at 12:00 PM.

To access the teleconference, please follow these directions: **(1) Dial the Meeting Number: (877) 336-1839; (2) Enter the Access Code: 1231334 #; (3) Press pound (#) to enter the teleconference as a guest.**

In preparation for and while engaging in a teleconference, please follow these guidelines:

1.  Use a landline whenever possible.

2.  Use handset rather than speakerphone.

3.  Identify yourself each time you speak.

4.  Be mindful that, unlike in a courtroom setting, interrupting can render both speakers unintelligible.

5.      **Mute** when not speaking to eliminate background noise, i.e., dog barking, kids playing, sirens, papers shuffling, emails pinging, drinking, breathing. It all comes through. This will also prevent interruptions.

6.      Avoid voice-activated systems that don't allow the speaker to know when someone else is trying to speak and they cut off the beginning of words.

7.      Spell proper names.

8.      Have judge confirm reporter is on the line.

9.      If someone hears beeps or musical chimes, that means someone has either come in or left the conference. Please be aware that the judge may need to clarify that the reporter has not lost the line. (This has happened before, and the reporter had to dial back in and tell the judge the last thing that the court reporter transcribed.)

Dated:    June 30, 2023
          White Plains, New York

SO ORDERED:

_____
        NELSON S. ROMÁN
     United States District Judge